## Welsh's Estate

Before Van Dusen, P. J., Sinkler, Klein, Bolger, Ladner and Hunter, JJ.

The facts appear from the following excerpts from the adjudication of

SINKLER, J., auditing judge.—This trust arises under a deed dated March 19, 1935, by which Albert R. Gallatin Welsh, settlor, transferred certain property specified therein to the Girard Trust Company and Charles N. Welsh, Jr., as trustees, to pay the income therefrom to settlor for life, and to distribute the principal on settlor's death in such manner as settlor should appoint by his will, or, in default of appointment, to persons designated in the deed of trust. The property thus transferred in trust was "all of the securities, money or other personal property forming part of the share of the said Albert R. Gallatin Welsh in the estate of his father, the late Charles N. Welsh." Distribution on default of appointment was to be made to the descendants of settlor then living, or if none, to Charles N. Welsh, Jr., if then alive, and, if not, then to his descendants.

The reason for filing the account, as set forth in the statement of proposed distribution, is the death of settlor on December 1, 1944. He was a resident of Delaware County, Pa., and letters testamentary have been issued in that county to the Girard Trust Company.

By the second paragraph of his will, dated November 18, 1940, settlor expressly exercised the power of appointment reserved to him in the deed of trust, and bequeathed the appointive estate to the Girard Trust Company and Charles N. Welsh, Jr., as trustees, to pay the income therefrom to settlor's widow, Helene Welsh, and their children until the death or remarriage of the widow, with further provision for distribution on the occurrence of either of such events, which provisions need not be repeated here.

Settlor was survived by his second wife, Helene Welsh, to whom he was married at the time of his death, and two minor children, Nicolai Rollaz Welsh and Alexandre Kiril Welsh, who were born January

22, 1938, and October 5, 1940, respectively. By decree entered May 20, 1946, by the Orphans' Court of Delaware County, Pa., The Real Estate Trust Company of Philadelphia was appointed guardian of the estates of these minors.

On May 16, 1938, subsequent to the execution of the deed of trust, settlor entered into a settlement agreement with Gabrielle Welsh, his first wife, to whom he was then married. By this agreement, settlor promised to pay his first wife the sum of $400 a month. On December 20, 1938, subsequent to the execution of the agreement, settlor and his first wife, hereinafter called claimant, were divorced at Zurich, Switzerland.

At the audit claimant asserted the right to receive $400 a month from the fund now accounted for, by virtue of the separation agreement. The fund now accounted for is not the estate of which decedent died possessed, but is the corpus of the trust created by the settlor's inter vivos deed, which corpus is now to be held on further trust according to the provisions of the second paragraph of settlor's will, by which he exercised the power of appointment reserved to him in the deed of trust.

The monthly payments to claimant had been made regularly, up to December 1, 1944, the date of settlor's death. Subsequent to the death of settlor's mother, on July 31, 1921, and up until his own death, settlor was entitled to receive one half of the income from a trust established by an inter vivos deed dated October 5, 1918, executed by his father, Charles N. Welsh. This income share averaged $25,000 a year. Subsequent to the execution of the separation agreement, settlor directed the trustee of his father's trust to pay the monthly payments to claimant from the income to which settlor was entitled, and the payments had been so made up to the date of settlor's death.

The right of claimant to receive monthly payments from the fund now accounted for is opposed on two

grounds: First, on the ground that the separation agreement created only a personal liability on the settlor, and that accordingly the right to receive such payments terminated with his death; second, on the ground that the claim to monthly payments cannot be asserted against the fund now accounted for in derogation of the right of the beneficiaries under the deed of trust. Consideration will first be given to the latter objection, for it raises a point which is, to some extent, jurisdictional and should therefore be first determined.

The separation agreement recites the circumstances leading to its execution, and states that it is agreed that settlor and claimant shall thereafter be free to live apart and that the separation agreement shall not be affected by either party's obtaining a divorce from the other. The agreement then recites:

"3. The husband agrees to pay to the wife, until her death or re-marriage, whichever event shall first occur, the sum of Four hundred Dollars (400) per month.

"4. The wife, having full knowledge of her husband's estate and full knowledge of the estates that he is likely to inherit, hereby releases the husband, and hereby remises, releases, quit-claims and forever discharges the estate of her husband, both real and personal from any and every claim that she now has, may hereafter have, or can have at any time, of, in and to or against the same or any part thereof, whether by way of courtesy or dower, or under the Intestate Laws of the State of Pennsylvania or any other State or country, or right to take against his Will, or in any other way whatsoever, excepting only the provisions in this agreement contained.

"5. It is further agreed that each of the parties may, by his or her last Will and Testament, or by any deed of writing, give way and dispose of any or all real estate, moneys, goods and chattels, of which he or she is now or may hereafter be possessed, and each agrees

that he or she will, upon the request of the other, sign any deed or paper or assurance which may be presented to him or her by the other or by the attorney for the other, for the purpose of enabling the other to dispose of any or all of his or her property, real or personal provided, however, that the husband shall do nothing which will operate to prevent or delay the payments to the wife provided for in this agreement.

"6. This agreement shall be binding upon the parties hereto, their respective heirs, executors, administrators and assigns."

An affidavit has been filed, on the basis of which it is found as a fact that claimant has not remarried. It has been stipulated that claimant was born November 15, 1906. She was thus 32 years of age when the separation agreement was executed on May 16, 1938, and was an adult. There is nothing to indicate that she was not fully competent, or that she signed the agreement because of any fraud, misrepresentation or undue influence. It is accordingly held that the recital that claimant had "full knowledge of her husband's estate and full knowledge of the estates that he is likely to inherit" bars her from denying that she knew that settlor had executed the trust deed of March 19, 1935; that said deed reserved to him a power of appointment; that the settlor received a large share of his income from the trust created by his father, which interest of settlor would cease upon his death; or that claimant knew of the actual value of settlor's estate. As the separation agreement is under seal, claimant is estopped to deny the trust of the recital that she had the full knowledge as therein set forth.

It is perhaps also worthy of note that settlor and claimant had married on October 25, 1933, and that it is accordingly possible, if not probable, that claimant actually knew of the execution of the trust deed at a period contemporaneous with its execution.

As respects claimant, the corpus of the trust created by settlor was property which had been disposed of by settlor prior to the execution of the separation agreement. As the power of appointment was created by the deed of trust, which antedated the separation agreement, the exercise of that power of appointment was not in derogation of the provisions of the separation agreement, for claimant made the agreement knowing, or deemed by law to know, that the corpus was subject to the power of appointment, or to a distribution specified in default.

There is nothing in the separation agreement which in any way limited settlor in making such exercise of the power of appointment as he chose. Paragraph 5 expressly states "that each of the parties may, by his or her last Will or Testament, or by any deed or writing, give away and dispose of any or all real estate, moneys, goods and chattels, of which he or she is now or may hereafter be possessed." When settlor exercised the power of appointment, he was not disposing of property of which he was possessed, because the donee of a power of appointment does not possess the appointive estate which he appoints. There is, accordingly, no provision in the separation agreement which prevented settlor from placing the corpus of the trust beyond the reach of claimant by failing to appoint any part thereof to claimant.

Claimant, however, asserts that she is in the position of a creditor, and that, as against her, the trust created for the benefit of settlor for life, and for the benefit of third persons on his death, is not valid. Reliance is made on Mogridge's Estate, 342 Pa. 308, in which it was held that creditors could reach trust property where settlor was himself the life tenant, and reserved a general power of testamentary appointment over the remainder. The decision in that case was based on the rationale that settlor had retained such substantial control of the property that it would

be inequitable to permit him to reap the benefits of ownership while depriving his creditors of the right to assert against the property claims held by them against settlor. To refuse to do so would, in effect, have been a fraud on creditors who had been deceived as to settlor's assets. This element is entirely lacking in the instant case. Claimant is not in the position of being deceived, because the trust was created before the separation agreement, and that agreement recites that claimant had full knowledge of her husband's estate, as above set forth. Claimant therefore knew of the risk to which her claim was subject, namely, that a substantial part of her husband's estate had already been transferred in trust and could, by the exercise of the power of appointment, be placed beyond her reach upon his death.

The trust corpus cannot be regarded as property over which settlor had such control during his lifetime that it should in equity be regarded as property actually possessed by him and accordingly subjected to the claim of claimant. Except for the right of settlor to withdraw principal sums to a total of $25,000, which total sum had been withdrawn prior to the execution of the separation agreement, the trust agreement expressly provides: "It is hereby understood and agreed by and between the parties hereto that this deed of trust shall be irrevocable in all of its terms and conditions." Accordingly, settlor had no power of disposition over the property during his lifetime. See Mc-Creary Trust, 354 Pa. 347.

The separation agreement is a carefully drawn document, and had the parties thereto desired to insure that settlor would exercise his power of appointment at least partially in claimant's favor, there is nothing which would have prevented them from providing that in the event settlor's personal estate was inadequate to establish an annuity reserve fund for the payments to claimant, that it was agreed that settlor would

create such a reserve fund by the exercise of the power of appointment under the deed of trust. The absence of such a provision or a similar provision cannot be cured by the court's attempting to rewrite the agreement and add to it a provision which the parties did not deem it advisable to include. The fund which would be required to provide monthly payments of $400 to claimant for the balance of her expectable life is calculated by counsel opposing the claim as totaling $192,000, if the calculation is made at the rate of two and one half percent. Regarding this amount as the approximate sum, it is apparent that an obligation to set aside such a fund is not to be assumed, but must be clearly stated in the agreement.

It is therefore held that the exercise of the power of appointment must be given effect according to its terms and cannot be limited or affected by permitting claimant to assert her claim against the fund appointed in trust. The claim of Gabrielle Welsh is accordingly dismissed as respects the fund presently accounted for.

### Re-adjudication

SINKLER, J., auditing judge.—An adjudication was filed by me in this estate on February 18, 1947, by which it was held that the claimant, the divorced first wife of decedent, was not entitled to payment from the trust fund here accounted for of sums promised her under a postnuptial agreement executed by her and the decedent. In view of my decision that the trust fund was not subject to such claim, even if valid, but that it should be asserted against the personal estate of the decedent, I made no decision respecting the liability of the decedent's estate under the agreement.

Exceptions were filed to this adjudication but, by decree entered April 18, 1947, they were dismissed pro forma and, with my consent, the matter was referred back to me to dispose of the question of the survival of liability under the agreement and the question

whether the claimant was entitled to assert her claim in this county in the trust administration without first proceeding in the administration by the executor of the decedent's will in Delaware County, Pennsylvania. . . .

1. Right to Assert Claim in Trust Estate Administration.

The question has been raised whether the claimant, who asserts a claim as creditor of the settlor, should be required to prove her claim at the audit of the decedent's individual estate in Delaware County, or whether she may proceed to do so in the administration of the trust estate pending before this court. In support of the contention that the claim should be disposed of in this court, it was stated (1) that the decedent's individual estate is inadequate to pay the claim if allowed, the individual estate totaling only approximately $1,400; (2) that even if the claim were first proved in the Delaware County administration, that determination would not be binding as against the trust fund here accounted for and the matter would then be relitigated in this county; and (3) that it is not believed that there are any debts owing by the decedent's estate.

It also appears that the executors have no objection to the determination of the claim by this court, and that no creditors' claims have been asserted in the executors' accounting. Under these circumstances, it appears expedient to determine the question in this court and that there will not be any prejudice to other creditors by so doing. See Plogstert Estate, 350 Pa. 474 (1944); Mackason's Appeal, 42 Pa. 330 (1862). To avoid any possible injury to other creditors, adequate provision will be made in the form of the final award.

2. Status of Claimant as Creditor.

In the original adjudication it was held that the divorced wife was not a creditor who could invoke the

rule of Mogridge's Estate, 342 Pa. 308 (1941), by virtue of which the trust fund in the hands of the trustee could be regarded as still being the property of the settlor. The argument before me and before the court en banc has been directed to the alternative of the wife's being a creditor or not being a creditor within this rule.

In writing the original adjudication it was not believed that the wife was a creditor in the same sense that the claimant in Mogridge's Estate was a creditor. Further analysis, not set forth in that adjudication, suggests that the three possible distinctions may be made of (1) a donee or noncreditor; (2) a dollar-for-dollar creditor, or one whose debt represents a "full consideration of money or money's worth"; and (3) a contract creditor who has given consideration for the debtor's promise to pay where the consideration therefor is adequate at law to support a binding contract but is not "full consideration in money or money's worth".

In view of the fact that the decedent and the claimant contemplated a divorce when they executed the agreement, there was difficulty in holding that the decedent's promise to pay the claimant was supported by a dollar-for-dollar consideration, when the consideration which she gave for the promise was the waiver of the right to share in the decedent's estate, in which she would not be entitled to share after her divorce. It is true that other rights were waived, but again these cannot be assigned a specific dollar value.

It is also true that the agreement recites merely that the parties will live apart because of differences, but in determining whether there has been full consideration for a promise the court may properly deduce the intentions and expectations of the parties from all surrounding circumstances. The agreement recites that it was executed on May 16, 1938. It contains a saving clause that divorce shall not affect the agreement. The

parties were divorced December 20, 1938. It may be reasonably concluded that the parties contemplated divorce when the agreement was executed.

The fact that the making of this agreement may have avoided any question of liability of the decedent to support the claimant does not base his promise to pay upon better consideration, for the surrender of the right to demand support was not made the price of the promise to pay and was therefore not consideration for it. Stelmack et al. v. Glen Alden Coal Co., 339 Pa. 410 (1940) ; A. L. I. Restatement of the Law of Contracts, §75, comment B. In this respect it is noted that the agreement recites as a reason for its execution : ". . . and Whereas, the husband has desired to provide for the payment of a fixed sum to his wife, voluntarily and not in fulfillment of any duty or liability to her under the circumstances".

Underlying the original adjudication was the premise that unless a wife could show that there was full consideration for her claim she was not entitled to the same protection given a dollar-for-dollar creditor. To pose a hypothetical case: Suppose a person buys an object reasonably worth $100, but agrees to pay $10,000 for it. The purchaser also borrows $10,000 from a bank and in course of time spends it. Thereafter both the seller and the bank demand payment of their respective claims of $10,000. The debtor has no personal estate, but has a trust fund of $10,000 of which he is the settlor and life tenant, and over which he has a general power of testamentary appointment. Would the public policy underlying Mogridge's Estate treat these creditors equally? Perhaps the same factors which have resulted in the rule that courts of law will not measure the value of the consideration for a promise would be operative to bar inquiry into the real value on which these creditors' claims were based. Perhaps the rule in Mogridge's Estate would be redefined in terms of value given by each claimant.

In my original adjudication, rather than determine the extent to which the claimant had given money's worth or value for her claim, no evidence respecting which was presented, I held merely that she was not a creditor within the rule of Mogridge's Estate, and dismissed her claim.

On the same day that the original adjudication was referred back to me for further consideration, an opinion was filed by the Supreme Court of this State in Neller Estate, 356 Pa. 628 (1947), which renders the foregoing analysis academic. In that case it was held that in determining deductibility for Pennsylvania inheritance tax purposes the claim of a widow under a postnuptial agreement to receive weekly payments during her husband's life and a stated proportion of his estate upon his death was a claim against or debt of the estate for which "adequate and full consideration in money or money's worth" had been given where the agreement was made in consideration of the wife's forbearance to enforce any claim for support against her husband.

While there is a strong dissenting opinion, in which two other justices join, which makes a valid distinction between an antenuptial and a post-nuptial agreement, the acceptance of the validity of this distinction does not impair the significance of this decision in its relation to Mogridge's Estate. In Neller Estate the court was confronted with a post-nuptial agreement by which the wife surrendered a right of uncertain or unliquidated value—the right to press her claim for support. The right thus surrendered was held by the majority of the court to be an *adequate and full consideration in* money or *money's worth* (Italics supplied). Since the exact money value of this surrendered right cannot be determined, the decision might have held in the language of the common law that the consideration given by the wife was a "valuable" consideration, and then conclude that a wife who has given "valuable" con-

sideration will be regarded as having given "adequate and full consideration in money or money's worth". The effect of the decision is that the wife has the same standing, so far as inheritance tax computation is concerned, as a dollar-for-dollar creditor.

It is to be noted that the court held that "adequate and full consideration" had been given. It did not hold merely that the consideration was "adequate" or construe the statute as requiring "adequate *or* (and) full consideration".

When the rationale of Neller Estate is joined with the solicitude traditionally shown by courts to wives executing nuptial agreements, the conclusion appears inescapable that the claimant under such an agreement, if she gave "valuable" consideration for the counterpromises of the husband, becomes his creditor within the meaning of Mogridge's Estate. In the instant case the claimant surrendered a number of rights by the agreement which, although uncertain as to value, must be regarded as valuable consideration, and that accordingly she must be regarded as a creditor who can assert her claim under the agreement against the trust fund now before this court, the provisions of the original trust deed and the provisions of the exercise of the settlor's power of appointment to the contrary notwithstanding. See also the final "proviso" of item six of the separation agreement. The contrary decision made by me in the original adjudication is accordingly set aside, on the basis of Neller's Estate and the principle of Mogridge's Estate.

In view of the conclusion that the trust estate is to be regarded as part of the decedent's personal estate as respects the claimant, the concluding "exception" to the first paragraph of the fourth item of the separation agreement assumes a broader meaning. That paragraph provides:

"The wife, having full knowledge of her husband's estate and full knowledge of the estates that he is likely

to inherit, hereby releases the husband, and hereby remises, releases, quitclaims and forever discharges the estate of her husband, both real and personal, from any and every claim that she now has, may hereafter have, or can have at any time, of, in and to or against the same or any part thereof, whether by way of curtesy or dower or under the Intestate Laws of the State of Pennsylvania or any other State or country, or right to take against his will, or in any other way whatsoever, excepting only the provision in this agreement contained."

As the above "exception" expressly preserves the liability of the decedent's personal estate for claims based upon the separation agreement, it must also be regarded as preserving the liability for such claims of the trust corpus which by Mogridge's Estate is to be regarded as part of decedent's personal estate as respects the claimant. The provision is therefore not a waiver but a preservation of the right to assert the liability to the claimant of the fund now accounted for.

The waiver is to be construed as limited to the release by the wife of such claims as she would be entitled to as wife or widow but not as claimant under the separation agreement. It would defeat the intention of the parties to hold that the agreement which gave the right of monthly payments to the wife was also a waiver of the very means to enforce those payments. In the absence of clear language to that end, such a conclusion will not be adopted.

3. Law Governing Effect of Separation Agreement.

Although no construction of the agreement was made in the original adjudication, it was there stated that under principles of conflict of laws it was believed that foreign law would probably be applicable. Counsel for the claimant and for the life tenant have stated to the court that they agree that the agreement should be construed under the law of Pennsylvania. This agreement is dated May 26, 1938. It is signed by both the

claimant and the decedent. Beneath the signature of the claimant appears what purports to be an official notation in French which states that the authenticity of the claimant's signature is certified to or attested. This notation is dated July 4, 1938, at Saigon. The next page of the agreement bears an acknowledgment signed by the decedent before the vice counsel of the United States at Zurich, Switzerland, on May 16, 1938. There is also a blank form of acknowledgment which was apparently to have been executed by claimant but which was not, the foreign certificate referred to above having apparently been executed. As the parties to this agreement were divorced within the same year, on December 20, 1938, in Zurich, Switzerland, it is quite possible that at the time of the execution of the agreement one or both of them had either an actual or a technical domicile in Switzerland.

Under these vague and disconnected facts there is nothing which so connects the agreement with Pennsylvania as to justify construing it according to the law of Pennsylvania. The fact that the agreement refers to rights under the laws "of the State of Pennsylvania or any other State or Country" does not require that the Pennsylvania law be applied.

The willingness of counsel that Pennsylvania law should control is merely an Alexandrian cutting of the Gordian knot. Of the same nature is the suggestion that it should be assumed that whatever law is applicable it is the same as Pennsylvania law. From the foregoing statements it may be surmised that whatever law is applicable it is law whose jurisprudence is entirely foreign to the Anglo-American jurisprudence of Pennsylvania. Nevertheless, since counsel do not choose to develop this point of the case, the agreement will be construed as though Pennsylvania law were applicable.

4. Construction of Separation Agreement Under Pennsylvania Law.

If the liability to pay the monthly sum of $400 was personal to the decedent and ended with his life, the claim must be dismissed. The obligation to pay money is, however, an impersonal duty, and by section 6 of the agreement it is stated that the obligation to make the payments shall be binding upon the parties, their heirs, executors, administrators and assigns. The claim of Gabrielle Welsh under the separation agreement therefore survived the decedent's death. See Huffman v. Huffman, 311 Pa. 123 (1933); see also Pierce's Estate, 123 Pa. Superior Ct. 171 (1936). She is hereby awarded from principal the total amount of all unpaid monthly payments accruing to the date of distribution; monthly payments of $400 to be made to her thereafter from principal in accordance with the provisions of the post-nuptial agreement. The amounts so awarded to her are subject to modification or revision upon further accounting in the trust estate in the event that the successful assertion of additional creditors' claims against the trust fund requires a recoupment by the withholding of all or some future payments to the claimant or requires a modification or termination of the right to such future payments. . . .

*Joseph H. Grubb, Jr.*, of *Newbourg, Grubb & Junkin*, for exceptants.

*Carroll R. Wetzel*, of *Barnes, Dechert, Price, Smith & Clark*, contra.

BOLGER, J., December 5, 1947.—The exceptions rest upon the following grounds: That the engagement of the husband was donative and not contractual; that if contractual it was purely personal and died with him; that if it did not die with him, it is not enforceable against the present fund; and that claimant wife in the separation agreement waived her remedy.

Does the adjudication present the equitable solution to the problem of the remedial rights of the wife? We

believe it does. The reasoning upon which the exceptions are predicated means that the wife not only debarred herself from any remedy against this fund, but against *any* property possessed by the husband either in his lifetime or disposed of by his will. It would follow as a necessary consequence that the agreement is ambiguous in that it creates substantive rights in the wife, but at the same time denies her the remedies to enforce them. We do not believe the parties intended such a construction. The natural meaning of the words we believe to be otherwise. A contract under which rights are created and remedies denied is as abhorrent to the law as a vacuum is to nature. That is the reason for the equity maxim, "No right without a remedy".

Prior to Commonwealth v. Richards, 131 Pa. 209 (1890) separation agreements most frequently involved the employment of the services of a trustee, apparently to protect the interests of the wife, as in Dillinger's Appeal, 35 Pa. 357. The Richards case, however, held that where the agreement did not provide for a trustee, the husband became the trustee "for the specific purpose in view". Accordingly, he must be held to contract in a fiduciary capacity and his contract scrutinized with care, and set aside if not found to be reasonable and in good faith. In Kaiser's Estate, 199 Pa. 269, 272, the court stated:

"As has been said, mutuality is the essence of equity. The reason, therefore, for the enforcement of the contract against the wife is that it would be manifest injustice and violative of every principle of equity to permit her to disregard and annul the agreement freely made by her for a good consideration and upon terms advantageous to her. She cannot retain the benefits of the transaction and repudiate her covenants given as a consideration for them."

Conversely, the husband cannot retain the benefits of the transaction and at the same time repudiate his covenants. We must give natural meaning to the

words of the contracting parties at the time and place when the contract was made, considering all the surrounding circumstances: Huffman v. Huffman, 311 Pa. 123.

This is not a donative agreement on the part of the husband. The statement in the deed that the husband was providing for his wife "voluntarily and not in fulfillment of any duty or liability to her under the circumstances" was inserted clearly for the purpose, later stated in the agreement, that it should not be used to prevent either party from divorcing the other. It is, therefore, no more than a gratuitous self-serving declaration. When weighed against the declaration immediately following, "Therefore, it is Mutually Agreed by and between the parties hereto", which is indisputably contractual, it loses force. However, the most important element in this determination as well as of the entire case is clause 3: "The husband agrees to pay the wife until her death or remarriage, whichever event shall first occur, the sum of Four Hundred Dollars ($400) per month"; in consideration of this promise the wife surrenders her present and future rights as a wife. It becomes necessary, therefore, to ignore the first quoted phrase in order to give this last clause its necessary effect: Alcorn Combustion Co. v. Kellogg Co., 311 Pa. 270; Commonwealth v. Nelson-Pedley Co. et al., 303 Pa. 174: "Nothing can be inferred which is in direct violation of that which is clearly expressed . . . because it cannot be assumed that repugnant or contradictory clauses were intended to be inserted in the contract."

In paragraph 4, the wife, after professing full knowledge of her husband's estate and of the estates he is likely to inherit releases all of her interest therein from any claim, "that she now has, may hereafter have or can have at any time". There then appears a reservation, the significance of which exceptants ignore.

This provides as follows: "excepting only the provisions in this agreement contained". The fact that the following section wherein the husband likewise releases his interest in the wife's estate, does not contain this phrase, indicates that it was inserted in the particular paragraph for some particular purpose. To construe that purpose as reserving to the wife all remedies she might have and need to protect and to recover her monthly payments of $400 limits the effect of her release of her husband's estate to that extent, i. e., that the release should not extend to claims for the monthly payments for her lifetime or widowhood: Mandle v. Gharing et al., 256 Pa. 121. Such construction is the only natural, fair and reasonable one, and such as will give effect to the phrase: Brennan's Estate, 324 Pa. 410.

In paragraph 5, the parties are authorized to alienate their respective estates by deed or by will, provided, however, that "the husband shall do nothing which will operate to prevent or delay the payments to the wife provided for in this agreement". This is an implementation of the change of property rights of the parties from those then subsisting to those of debtor and creditor. The wife authorizes the husband to alienate his property in life or by will, as consideration for this covenant. The language of this proviso is so broad that we regard it as a condition annexed to the powers granted the husband thereinbefore: Forscht v. Green, 53 Pa. 138. The natural interpretation of this clause, and the one that is reasonable and equitable, is that the husband agreed that his right to alienate property by deed or by will or to appoint under any instrument should be subordinated to his wife's remedy to collect therefrom the monthly payments, and to refrain from placing the trust res beyond his wife's reach whether by exercising the reserve power of appointment, which we must assume the parties knew existed, or contract to place them beyond her reach. In creating the credi-

tor status of the wife, the husband created also her remedy to proceed against the trust fund the assets of which, as to her, were in equity retained in the possession of the husband. This construction gives the phrase a reasonable and natural meaning insofar as the status of the wife is concerned. The exceptions, on the other hand, overlook the full significance of this proviso: Brennan's Estate, supra. The husband violated this covenant by appointing in defiance of it.

While the exceptions maintain that even if claimant occupy the status of creditor, her admission in the agreement that she then knew all about her husband's present estate as well as any in expectancy negatives any accusation of fraud in the execution of the deed of trust. From this it is implied that she knew that her husband had assigned his property and had reserved to himself a power to appoint it by will and thus place it beyond her reach. Unfortunately, this is a misconception of claimant's position. She does not rely upon fraud. In fact, she has two arrows to her bow, each distinct from the other and neither of which is based upon fraud. The first is that as to subsequent creditors, it is against public policy for one so to limit his property in trust that he retains to himself the beneficial interests of ownership therein and yet places it beyond the reach of those to whom he is or may become indebted. He is not permitted to have the benefits of ownership, including the right to receive the income for life and to appoint the principal by will, and yet to deprive creditors of their right to have payment of their debts out of his property: Mogridge's Estate, 342 Pa. 308. In this case the court said: "His relationship to creditors was not changed by the creation of the trust." No reference is made in this, or in any of the line of cases of which it is a leader, to fraud. The rule is primarily based upon public policy and regards the assets of the settlor in equity, insofar as creditors are

concerned as *continuing constructively in the posses-sion of settlor.*

This principle is treated very clearly in A. L. I. Restatement of the Law of Trusts, §156(1) as follows:

"Section 156. WHERE THE SETTLOR IS A BENEFICIARY.

"(1) Where a person creates for his own benefit a trust with a provision restraining the voluntary or involuntary transfer of his interest, his transferee or creditors can reach his interest. . . .

"a. *Intention to defraud creditors not required.* The rule stated in this Section is applicable although the transfer is not a fraudulent conveyance. The interest of the settlor-beneficiary can be reached by subsequent creditors as well as by those who were creditors at the time of the creation of the trust, and it is immaterial that the settlor-beneficiary had no intention to defraud his creditors.

"c. *Reservation of general power to appoint principal.* If the settlor reserves for his own benefit not only a life interest but also a general power to appoint the remainder by deed or will or by deed alone or by will alone, his creditors can reach the principal of the trust as well as the income."

Numerous appellate court cases in accord appear in the Pennsylvania Annotations of these paragraphs.

The second arrow in claimant's bow is the implied covenant in the proviso in paragraph 5 of the agreement above referred to wherein the husband agreed to do nothing which will operate to prevent or delay the payments to the wife. We regard this proviso as an implied restraint voluntarily entered into by the husband upon his right to appoint under the deed of trust. While there is no authority to sustain this conclusion, we are of opinion that Jackson Trust, 351 Pa. 89, and other authorities postulate it. In Jackson Trust, supra, the court honored assignments of settlor's in-

terests to creditors containing waivers of power of appointment by will, as against the claims of appointees under settlor's will. The court expressly stated that the decision was not predicated upon the creditors' standing as creditors, but as assignees, citing Lyon v. Alexander, 304 Pa. 288, to the effect that the holder of a power of appointment may obligate himself respecting that power. We refer also to the Act of June 1, 1945, P. L. 1337, where, in section 2, authority is granted for the possessor of a power to release or disclaim it absolutely or conditionally as to the whole or any part of the property subject to such power or interest. We point also to Mogridge's Estate, supra, where the court honored two assignments when the claims of creditors under the first assignment did not exhaust the fund completely. It is logical, therefore, to hold that if the holder of a power of appointment may release or extinguish the power altogether, he may perform the lesser act of contracting to limit or restrain himself in the exercise of it. The power being irrevocable does not place its exercise beyond the reach of creditors: Mogridge's Estate, supra; Jackson Trust, supra. The case of McCreary Trust, 354 Pa. 347, cited by exceptants, has no application because it deals solely with the rule against perpetuities.

The exceptions point out that the capitalization of a fund to provide an income of $400 per month at the rate of $2\frac{1}{2}$ percent, would amount to $192,000 and, therefore, it was not within the intention of the parties that the husband should be required to set up such a huge sum. It might just as well have been in the minds of the parties that the husband intended to appoint $400 per month to his wife for life, since there is no requirement provided in the instrument for the manner of his paying the $400 per month at any time, during or after his life. It is also quite possible that the parties anticipated that the wife would die or remarry before the death of the husband. The award in

the adjudication of $400 per month from the trust is fair and just and is full answer to this argument. However, the argument lacks the weight to overcome the greater implications pointed out before, especially the express obligation to pay the sum until the death or remarriage of the wife and that the obligation so to do should be binding after the death of the husband upon his heirs, executors, administrators and assigns.

In creating the position of debtor and creditor, the parties have been very specific. The husband obligates himself to pay $400 per month to the wife until her death or remarriage and in the last paragraph of the agreement this obligation is made binding upon himself, his heirs, administrators and assigns. We regard these two paragraphs as the most important provisions of this contract and the ones upon which the construction of every other provision must be predicated. The husband was then receiving not less than $25,000 per year income and he possessed a power of appointment in an estate of more than $300,000. His financial responsibility was thus fixed. According to the authorities, this contract is not personal in character. Its provisions are more than merely a substitute for alimony. It *expressly* was intended by the parties to survive the death of the husband. Nowhere in its terms does it limit the payments to the life of the husband. We cannot hold the payments shall cease at the husband's death in the absence of an express provision to that effect: Young v. Congaware, 275 Pa. 285; Johnson v. Ritter, 111 Pa. Superior Ct. 482; Hild v. Dunn, 310 Pa. 289; Commonwealth v. Nelson-Pedley Co. et al., supra. In Pierce's Estate, 123 Pa. Superior Ct. 171, the court upheld a claim by a wife against the husband's estate when the latter agreed to pay the sum of $20 per week for her support, said "weekly payments to be made as long as the said Clarissa F. Pierce shall live, or in case of a divorce by either party as long as she shall not remarry". There is nothing in the rela-

tionship of the parties or in the phraseology of this contract to include it in the classification of personal obligations given by Chief Justice Maxey in Fullmer's Estate, 319 Pa. 360, 366:

"The indemnification agreement here did not partake of a contract personal in its nature. It was not like the contract of an artist to paint a portrait or that of a surgeon to perform an operation or that of an actor to play a rôle. In such contracts and in the absence of a provision therein for a substituted performance, personal performance is the thing contemplated and the death of the personal performer ends the possibility of performance."

The substitution of the heirs, executors and administrator of the husband constitutes a provision for a substitute performer for the husband in the operation of this contract. This is the only fair interpretation that will render the agreement reasonable and mutual and at the same time give full effect to all of its provisions.

Accordingly, the exceptions are dismissed and the adjudication confirmed absolutely.