Ervin Estate.

Argued May 2, 1968. Before BELL, C. J., MUS-MANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

*Gilbert P. High, Jr.,* with him *High, Swartz, Roberts & Seidel,* for appellant.

*J. Brooke Aker,* with him *Arthur W. Bean,* and *Bean, DeAngelis, Tredinnick & Giangiulio,* and *Smith, Aker, Grossman & Hollinger,* for appellee.

OPINION BY MR. JUSTICE O'BRIEN, July 1, 1968:

This is an appeal from the decree of the Orphans' Court of Montgomery County, dismissing exceptions to the adjudication. The issue presented is a very narrow one: "Does Paragraph 10 of the November 8, 1959 agreement between appellant, Marybeth G. Ervin, and decedent, Kenneth D. Ervin, represent an obligation of the estate to make annual payments, or does the obligation terminate at Kenneth Ervin's death?"[1]

On November 8, 1959, decedent and appellant, then his wife, executed an agreement which was supplemented by a second agreement dated November 18, 1959. Subsequently the parties were divorced and the decedent married Elizabeth G. Ervin, who became executrix of his estate. The crucial paragraph is Paragraph 10 of the November 8 agreement, which provides: "10. Husband agrees to pay to Wife for support and maintenance and as alimony, the sum of ten thousand dollars per year, such sum to be paid in monthly payments of $833.33. Such payments shall be regular and periodic, the first payment to be made on November 1, 1959 and to continue until November 1, 1963. On and after November 1, 1963 said annual payments to Wife for support and maintenance and as alimony, shall be reduced to seventy-seven hundred and fifty dollars ($7750.00), which shall be paid in regular periodic monthly payments of $645.84, which payments shall continue until April 1, 1968. On and after April 1, 1968 said annual payments to Wife for support and maintenance and as alimony, shall be reduced to $5500.-00 which shall be paid in regular periodic monthly pay-

---

[1] Appellees also contend that the appeal should be dismissed because of alleged procedural defects in the exceptions to the original adjudication. In its "Opinion Sur Exception to Adjudication", the court below found no merit whatsoever in this contention, and we fully agree with the court below.

ments of $458.33. It is further agreed between the parties that the aforesaid sums shall be paid to Wife in the amounts and at the times designated until her death or prior remarriage, at which time Husband's obligation to pay any amounts to her shall cease and determine."

The facts being agreed to, the only issue was the interpretation of this clause. The court below held that the obligations of decedent ceased at his death. We conclude that the Orphans' Court erred in its interpretation of the agreement.

In the first place, the words of Paragraph 10 itself indicate an intention that the payments continue after decedent's death. The express words of the agreement state that the sums should be paid to appellant "until her death or prior remarriage." In *Huffman v. Huffman*, 311 Pa. 123, 166 Atl. 570 (1933), this Court faced a similar situation. In a separation agreement, the husband agreed to pay $30 per month to the wife for the support of each of two children, until each child became self-supporting. Subsequently, the wife obtained a divorce and the husband died. When the ex-wife sued the husband's estate, the administratrix claimed that the obligation terminated at the husband's death. We held: "It is clear beyond question that the agreement has not been fully complied with, since the children are not, as yet, self-supporting. . . . It is . . . idle to say that the agreement was personal between the plaintiff and testator, or that it was intended to terminate at his death. There is nothing in the agreement, or in the surroundings of the parties at the time they made it, from which either conclusion can properly be drawn. As we said in Foundation & Construction Co. v. Franklin Trust Co. et al., 307 Pa. 10, 15: 'The standard for the interpretation of words is their natural meaning to the parties who have contracted at the time and place where the contract is

made, considering all the circumstances surrounding it: McMillin v. Titus, 222 Pa. 500. . . . Words are to be construed according to their primary acceptation unless, from the context of the instrument and the intention of the parties to be collected from it, they appear to be used in a different sense.' By his agreement, testator agreed to pay the specified sums for the support and maintenance of his minor children, until they became self-supporting, and there is no other language therein which in any way otherwise limits or fixes the time during which the payments are to be made."[2] Here decedent agreed to pay until appellant's death or marriage and no other language limits the time during which payments are to be made. See also *Welsh's Estate,* 61 Pa. D. & C. 47 (1947).

Moreover, any possible ambiguity in Paragraph 10 itself as to whether payments continue after the husband's death can be resolved by considering other portions of the agreement. Paragraph 11 provides, in relevant part: "11. Husband further agrees to pay to Wife for her support and maintenance and as alimony, thirty-five per cent of two-fifths of the net income, as and when payable, under a certain deed of trust created by J. Herbert Ervin and Mabel K. Ervin, his Wife, dated December 26, 1935, . . . It is further understood and agreed between Husband and Wife that Husband agrees to pay this amount . . . until the death or prior remarriage of Wife or until the death of Husband, whichever shall first occur . . ."

Here the parties specifically provided that payments would terminate at the husband's death. They

---

[2] Although it makes no difference whether the payments are for the support of the wife or for the support of the children, we might point out that the reductions in the payments in the instant case correspond to the years in which the parties' children attain the age of eighteen; so the parallel between *Huffman* and the instant case is continued.

recognized the problem that might arise and provided for termination. The failure to make the same provision in Paragraph 10 is a strong indication that the parties intended payments to continue after the husband's death.

Paragraph 4 of the Supplemental Agreement also provides an indication that payments should continue to be made after the husband's death. That Paragraph provides: "4. In the event that Husband should become totally or partially disabled from practicing medicine, by reason of illness or accident or other cause beyond his control, and, by reason thereof, the income received by him from the practice of medicine should be reduced, then and in such event, Wife agrees that the amounts to which she is entitled under paragraph 10 of the agreement to which this is a supplement, shall become reduced in the same proportion as Husband's earned income is reduced from what it was the year previous to such illness, accident or other cause beyond his control, and shall continue to be so proportionately reduced during the period that Husband should continue to be partially or totally disabled from practicing medicine."

The parties specifically dealt with another eventuality which could affect the periodic payments to appellant—the problem of incapacity—and provided for a reduction of payments. Yet they did not deal with the problem of the husband's death, although such an eventuality was surely considered by the parties, as indicated by Paragraph 11 of the original agreement. Again, the inference is that the omission was intentional, and the parties intended the husband's estate to be liable.

Two other paragraphs also support an inference that the parties intended payments to continue after the husband's death. In Paragraph 17, the wife discharged the husband's estate from all claims by way

of dower, from any right to take against the husband's will, and for support or maintenance of any nature whatsoever, *"except only as to rights accruing to Wife under this agreement."* Paragraph 20 stated that "the parties hereto bind themselves, *their heirs, executors, administrators and assigns."* (Emphasis added). The court in *Welsh's Estate,* supra, relied upon clauses like both of these as showing an intention that the estate be liable, while the court in *Victor Estate,* 10 Fid. Rep. 44 (1959), emphasized the absence of both clauses as indicating an intention that payments terminate at death.

The only circumstance that could possibly be viewed as supporting an intention that payments terminate at the husband's death would be Paragraph 6, providing that the husband maintain $35,000 of life insurance in favor of appellant. A similar paragraph in *Victor Estate,* supra, was interpreted as some support for an intention that the payments terminate. The life insurance would constitute one final lump sum payment. The court in *Victor Estate* emphasized, however, that it was not attaching much importance to that paragraph. In our view, there is no reason why the life insurance cannot be in addition to the payments under Paragraph 10. The many indications of an intention that the payments continue far outweigh any inference to be drawn from the insurance.

Nor does any of the authority cited to us by appellees dictate otherwise. Appellees rely heavily on the language of the instant agreement that the payments are "for support and maintenance and as alimony." In their view, payments pursuant to a support or alimony agreement terminate at the husband's death unless the agreement explicitly provides otherwise, whereas payments pursuant to a property settlement become an obligation of the husband's estate. As support for

this view, they point to *Scott Estate,* 394 Pa. 39, 145 A. 2d 669 (1958) and *Watrous Estate,* 95 Pa. Superior Ct. 11 (1928). In *Scott,* this Court held the husband's estate liable because the payments were pursuant to a property settlement rather than alimony. Conversely, in *Watrous,* the Superior Court held that payments designated as alimony terminate at the husband's death. However, two things should be borne in mind about both of those cases. In the first place, they were interpreting the law of foreign jurisdictions— New Jersey in *Scott* and Nebraska in *Watrous.* Both of those states permit alimony, whereas Pennsylvania does not. Secondly, those cases refer to alimony terminating at the husband's death, not to support terminating at that time. Of course it is true that a husband's obligation to support his wife terminates at his death. *Wolfsohn v. Solms,* 392 Pa. 129, 139 A. 2d 523 (1958). Yet *Wolfsohn* went on to point out: "On the other hand, if the parties to a separation agreement intend that the husband assume obligations beyond those imposed by law, the obligations will survive the husband's death and so bind his estate." A husband's obligation to support his wife ends not only at his death, but also upon a divorce from the bonds of matrimony. It proves too much for appellee to say that this agreement simply codified his legal obligation to support, for there was no question but that it continued in effect after the parties were divorced. In this respect, the instant case differs from *Patton v. Patton,* 2 Penny. 394 (1882), in which the claimant was not an ex-wife, but a widow. In that case, it was possible to read the agreement as merely codifying the husband's legal duty to support. This is not possible, however, where the intent is clearly to go beyond the legal duty to support.

We therefore hold that appellant is entitled to payments from decedent's estate. The decree of the

court below is reversed, and the case remanded for proceedings consistent with this opinion. Costs to be borne by the estate.