**Cachelin Estate**

*Edward P. Clayman,* for accountants.

*Peter C. Paul* and *Morton F. Daller,* of *Rawle & Henderson,* for claimant.

TAXIS, P. J., January 19, 1973.—The first and final account of Phyllis M. Cachelin and Industrial Valley Bank and Trust Company, executors, was examined and audited by the court on June 19, 1972.

The account shows a balance for distribution of $52,431.52, composed of securities set forth on the second page thereof, $46,446.53; automobiles on page 5, $2,600; and cash.

The transfer inheritance tax has not been paid, and calculation thereof is awaiting the determination herein of a claim against the estate by decedent's former wife. Such tax as shall be due is hereby awarded to the register of wills, payment thereof to be reflected in the schedule of distribution hereinafter directed to be filed.

The claim in question has been filed on behalf of decedent's daughter, Alice Cachelin, by Emilie H. Bruzzo (now Countess de Rohan Chandor), decedent's former wife.

The statement of claim recites that decedent and claimant entered into an agreement on October 11, 1966, which provided for payment by decedent of support for Alice at the rate of $200 per month, together with certain medical and dental expenses. It is further set forth that decedent complied with the agreement during his lifetime but that his estate now refuses to acknowledge liability for the payment of any such amounts after decedent's death, which was on April 9, 1971. Claim is, therefore, made for (1) support at the rate of $200 per month for the period May 1,

1971, until paid; (2) payment of $345 in reimbursement of medical and dental expenses incurred after decedent's death; and (3) the award back to the executors of a fund of $10,000 to secure the payment of future support and medical expenses according to the terms of the agreement.

The executors oppose the claim on the grounds that the agreement in question did not survive decedent's death. In summary, the agreement recites that it was made on October 11, 1966, by Emilie H. Bruzzo and Alfred M. Cachelin, and that a basis for it was the voluntary relinquishment of custody of Alice by her father to claimant. The agreement provides that Emilie H. Bruzzo should have custody of the child subject to detailed rights of visitation in the father, and that decedent would pay support until ". . . the child reaches twenty-one (21) years of age, is emancipated, is employed fulltime or married." A following provision contained the obligation to pay medical and dental expenses. Leave was given to the mother to enroll the child in private school subject to the approval of the father, and the right to settle disputes in this respect was given to Judge George M. Carney, a Justice of the Supreme Court of New York, or any current replacement for him. It was next agreed that the child would not be taken out of the United States, that she would be brought up under certain nonsectarian religious principles, that the Supreme Court of the State of New York should have jurisdiction of the parties and the child, and that the parties would keep each other fully informed as to any illnesses of the child.

Alice was born on March 29, 1954, graduated from high school in 1972, and intends to attend college. In 1962 or before decedent had changed his domicile from New York, first to Washington, D. C., and then to

Pennsylvania, Alice resided with him from 1963 to 1966. Decedent married Phyllis M. Cachelin, his widow, in November 1962, and the couple had two sons, now about nine and seven years of age. Claimant still resides in New York, and Alice lives with her. The occasion of the transfer of custody of Alice was litigation in New York commenced by claimant, which was terminated by an amicable settlement and the execution of the agreement now before us. This agreement was included in the decree of the court finally terminating the custody action. Both parties to the action were represented by New York counsel of their own selection.

It is undisputed that Alice Cachelin is not yet 21, is still in school, has not been emancipated, is not employed full time, and is unmarried. Decedent recited in his will, made in 1970, that he made no provision therein for Alice because she ". . . has heretofore had adequate and substantial provision made for her health, education and support during her lifetime. . . ." It does not appear, however, that Alice is beneficiary of any insurance, trust, or other gift from her father which would fit his testamentary description of "adequate and substantial provision" for her. We are now required to determine whether decedent's estate remains liable for the performance of the agreement of October 11, 1966.

It is first necessary to consider what substantive law governs the construction of the agreement in question. Both sides to this litigation in effect concede that the issue is not one of procedure or enforcement, in which case the law of the forum applies (8 P. L. Encyc. 9, §4), but relates rather to the validity, effect and interpretation of the contract, ruled by the law of the place where it was made, which, in the present

case, is New York: 8 P. L. Encyc. 8, §2. Alternatively, and assuming without deciding that Griffith v. United Air Lines, Inc., 416 Pa. 1 (1964), is applicable to contract matters of this sort, the State which has the most significant contacts or relationship with the parties and the agreement also is New York. The mother and child reside in New York, the contract was made and performed there, it provides for jurisdiction in the New York court over the parties and it was made part of an order of a New York court. The only contact with Pennsylvania is that decedent was domiciled here when he died.

Determination of the applicable New York law, however, is another matter. Counsel for both sides have referred to a number of New York cases, all in lower courts, the decisions in which respectively favor the results which each counsel is seeking. Try as we may, however, we have not been able to discern the application of any fixed rules or principles of interpretation in these cases, but, on the contrary, each appears to be decided on its own facts. Undoubtedly, certain fundamental precepts appear in these cases, which do not differ, as a matter of fact, from Pennsylvania law on the same subjects. For example, a support order, without more, does not survive death: Cooke v. Cooke, 154 N.Y. Supp. 2d 757 (1956). Nevertheless, parties may enter into support agreements which will continue beyond death as independent contracts if it appears that this was their intent. Such intent may either be specifically set forth, or can be deduced or determined from a reading of the agreement as a whole: Silver's Estate, 201 N.Y. Supp. 2d 415 (1960). Beyond these fundamental rules, however, the New York decisions do not appear to represent or apply any general rule of construction concerning

survival or nonsurvival, and to some extent seem to be inconsistent with each other and the language used in the agreements they interpret.

Counsel for the estate rely especially on Johnson's Estate, 56 N.Y. Supp. 2d 771 (1945), and Bernstein's Estate, 203 N.Y. Supp. 2d 191 (1960). Both of these involve agreements between the parties which were made part of or were reflected in a final court decree, which has no effect after the death of the obligor. In both of those cases, incorporation of the agreement in a judicial decree appeared to settle the matter as far as the court was concerned, although in Bernstein the court did additionally find that there was no intent expressed in the agreement, even if it were considered to be effective apart from the decree, that it survive the obligor's death. In Bernstein, moreover, the duration of the agreement was specifically set forth to be "during the life" of the wife, making no reference to the husband's death; but the court passed over this specific language since it was contained only in the decree of separation and not in an independent agreement, although the decree was actually, if not in exact form, the reflection of an agreement previously reached by the parties' counsel.

Somewhat conversely, in Van Arsdale's Will, 75 N.Y. Supp. 2d 487 (1947), the court held that a stipulation of record by the parties was not intended to merge in the final decree. In concluding that the agreement survived the death of the obligor and was an obligation of his estate, the court said, "I hold that there was no intent that all the rights under the stipulation of the parties should be merged in the judgment of divorce." It is thus difficult to ascertain whether the limiting effect of merger in a judicial decree is a rule of law, or whether such merger serves simply as one indica-

tion, among others, of what the intention of the parties probably was.

Another problem relates to the provision which appears in many agreements that they shall also be binding on the heirs or legal representatives of the parties. In one case, Fredenthal's Estate, 206 N.Y. Supp. 2d 194 (1960), it was held that the absence of such language was ". . . not a basis for limiting its (the agreement's) effectiveness to the lifetime of the husband." In Breaznell's Estate, 228 N.Y. Supp. 2d 921 (1962), however, this language, although contained in the agreement, was held not to extend it beyond death where the agreement also provided for its termination if the husband lost his position with a designated bank, he thereafter to make "reasonable and proper provision" for support. The court found, in effect, that his death was within the latter provision, even though it did not specifically refer to this contingency, and notwithstanding the fact that the agreement by its own terms bound the heirs, administrators and assigns of the parties.

We are unable, on this record and upon the proof of New York law which has been submitted, to determine with any assurance how the present claim would be decided there. Generally, the law of these cases appears much like that of Pennsylvania, as one might well expect; but in application, the results seem uncertain and not always consistent with each other. In these circumstances, where we must either guess at foreign law or apply our own, the law wisely dictates the latter course. "In any event, if there is no pertinent decision or statute, or if there is a very substantial doubt about the law of a sister state, the law of a common law sister state in such situations and at the time in question is presumed to be the same as that

of this Commonwealth": Pennington Trust, 421 Pa. 334, 340 (1966).

Fundamental in our contract law is the rule that the death of an obligor does not end his responsibility for performance, which is usually transferred to his estate: Stormer Estate, 385 Pa. 382 (1956). An exception to this rule exists, logically, where the contract involves performance by an obligor which is personal or peculiar to him and which he alone can provide; but where such considerations are absent, and the contract can be performed by the obligor's estate or by transfer or assignment to another, the inference is that a personal relationship was not contemplated, and liability remains: Stormer Estate, supra; Billings's Appeal, 106 Pa. 558 (1884). This rule was applied to support agreements in Huffman v. Huffman, 311 Pa. 123 (1933), where the court said at page 127:

"[I]f the true construction of the language of an agreement is that it shall continue in force only so long as the parties to it survive, it will be limited in duration accordingly, . . . So, too, from the character of the contract itself, a limitation of time to the lives of the contracting parties might be necessarily implied, though not directly expressed. All of the cases under this head fall into one of two classes, . . .

"The first class embraces those cases in which it clearly appeared that the personal qualities of one party to the contract constituted a potential inducement to its making . . . To the second class belong the cases where, if only the language of the contract was considered, it would appear that the performance required would extend beyond the time during which executors and administrators are, by statute, to settle the estate."

The result of the application of this rule, in Huffman, was that an agreement of support for two

children, which was to continue in force until they should "become self-supporting," was held to survive the death of the father, because, at page 126: "It is clear beyond question that the agreement has not been fully complied with, since the children are not, as yet, self-supporting." The contract was neither a personal one, being only for the payment of money, nor did its performance unreasonably prolong the settlement of the estate; therefore, and considering only these aspects, the court held that it remained a liability of the estate.

Clearly, the contract before us is not personal, nor would it prolong the settlement of an estate, since even the future payments required by it could be covered by a fund or otherwise guaranteed. The remaining question, therefore, is whether there appears in its language, or by any implications which reasonably must be drawn from that language, that the parties intended it to terminate at decedent's death. In Huffman v. Huffman, supra, the court found that the contract terminated, by its own unambiguous terms, at a certain time not related in any way to the death of the father, and, therefore, it remained an obligation of his estate.

In Wolfsohn v. Solms, 392 Pa. 129 (1958), the agreement in question endured, by its own terms, for a period of one year. When the husband died within the year, the agreement was held to survive his death. Admittedly, there were other factors in the case which reinforced this conclusion, such as additional provisions that the wife would sign the parties' joint income tax return, and that the agreement bound decedent's heirs, executors and administrators; but the amount sought in the action and allowed by the court was for the one-year period, which was the clear extent of the duration of the agreement.

In Schlager Estate, 6 Fiduc. Rep. 50 (O. C. Lackawanna 1955), the court construed an agreement which was to be in effect "during the minority of the child or until she shall commence her preparatory or collegiate education" as expression of an intent that the agreement remain an obligation of his estate.

In Ervin Estate, 430 Pa. 431 (1968), although the agreement covered more subjects than the one at hand and was thus even more clearly not just a private support order, the Supreme Court placed great reliance on the specific terms of the agreement to conclude that it remained in effect after the death of the obligor. Pointing out that the duration of the agreement was explicitly set forth in language which did not refer to the death of the obligor, the court said at page 433:

"The express words of the agreement state that the sums should be paid to appellant 'until her death or prior remarriage.' In Huffman v. Huffman, 311 Pa. 123, 166 Atl. 570 (1933), this Court faced a similar situation . . . (There followed a detailed discussion and quotation from Huffman) . . . Here decedent agreed to pay until appellant's death or marriage and no other language limits the time during which payments are to be made. See also Welsh's Estate, 61 Pa. D. & C. 47 (1947)."

The agreement before us obligates decedent to pay until his daughter reaches 21, or is employed, emancipated or married. None of these conditions or events has occurred. We believe, therefore, that we need go no further than the authority just discussed to conclude that the present agreement survives the death of decedent. Although it was included in a final decree of the New York court, it had more provisions concerning the care, education, religious training and general

upbringing of the child than would normally be encompassed in a support or custody decree. It nowhere appears that its validity or effectiveness was intended to depend upon its incorporation in a court decree. The father, by it, expressed sincere concern for his daughter's rearing, and undertook definite burdens until it was complete. It would be anomalous, we think, to allow the unfortunate accident of his death to become a controlling factor in this, where no party to the agreement contemplated that it would be.

Some effort was made at the hearing to introduce evidence concerning the present financial circumstances of Emilie M. Bruzzo, and also to demonstrate what other provisions decedent had or had not made for Alice Cachelin and for his two younger children. We reserved some rulings on the admissibility of this evidence, but now rule that it is all inadmissible in the light of the construction which we have placed upon the agreement and the manner by which we have reached our conclusion. We believe that the cases heretofore cited are sufficiently clear in demonstrating that this agreement continues in effect after decedent's death, that equivocal evidence of this sort could not change the result. In any event, evidence of the financial circumstances of parties to a support agreement which is unambiguous has been held irrelevant: Ashbaugh v. Ashbaugh, 167 Pa. Superior Ct. 368 (1950).

Accordingly, the claim of Emilie H. Bruzzo is allowed, except as to the medical expenses, in support of which no evidence was presented. There is allowed and awarded to claimant the sum of $200 per month, from May 1, 1971, until the time of payment. It is further directed that the sum of $10,000 shall be awarded back to the executors for payment of such

further amounts for support and for medical and dental expense as shall become due for the period the agreement continues in force.

Subject to distributions properly made, and as modified by this adjudication, the net ascertained balance for distribution is awarded as suggested in the last paragraph of the petition for adjudication.

The account is confirmed, and it is hereby ordered and decreed that Phyllis M. Cachelin and Industrial Valley Bank and Trust Company, executors, as aforesaid, forthwith pay the distributions herein awarded.

Counsel for accountants shall file a schedule of distribution in duplicate.

And now, January 19, 1973, this adjudication is confirmed nisi.