# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2014-CA-00745-COA

**LEE VOULTERS**                                                        **APPELLANT**

v.

**LESLIE DAYLE VOULTERS**                                        **APPELLEE**


DATE OF JUDGMENT:               05/12/2014
TRIAL JUDGE:                           HON. VICKI R. BARNES
COURT FROM WHICH APPEALED:   WARREN COUNTY CHANCERY COURT
ATTORNEYS FOR APPELLANT:     DAVID M. SESSUMS
                                            PENNY B. LAWSON
                                            J. MACK VARNER
ATTORNEYS FOR APPELLEE:      WILLIAM R. WRIGHT
                                            AMANDA JANE PROCTOR
NATURE OF THE CASE:            CIVIL - DOMESTIC RELATIONS
TRIAL COURT DISPOSITION:      APPELLEE ORDERED TO PAY
                                            APPELLANT $30,000 FOR PRIOR
                                            ADVANCES; APPELLANT HELD IN
                                            CONTEMPT FOR FAILURE TO PAY
                                            $20,000 IN ALIMONY; APPELLANT
                                            ORDERED TO MAINTAIN A LIFE
                                            INSURANCE POLICY NAMING APPELLEE
                                            BENEFICIARY IN THE AMOUNT OF
                                            $1,080,000; APPELLANT ORDERED TO
                                            PAY $5,000 IN ATTORNEY'S FEES
DISPOSITION:                        AFFIRMED - 12/08/2015
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

### BEFORE GRIFFIS, P.J., BARNES AND MAXWELL, JJ.

### BARNES, J., FOR THE COURT:

¶1.    In this domestic-relations case, Dr. Lee Voulters appeals the judgment of the Warren

County Chancery Court related to maintenance of a $1.08 million life insurance policy for

his former wife, Leslie Voulters.  Finding no error, we affirm.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

¶2.     In April 2004, Leslie and Lee Voulters were granted a divorce on the ground of irreconcilable differences after twenty-six years of marriage.  Leslie did not work outside of the home but raised the children; Lee is a physician.  The parties executed an agreement for the custody and maintenance of their remaining minor child and for property settlement (the Agreement), which was incorporated into the judgment of divorce.  Lee was ordered to pay $10,000 per month in alimony until reaching the lump sum of $1.08 million.  Lee was also to maintain a life insurance policy for $1.08 million, naming Leslie as the primary beneficiary.  The Agreement did not provide for termination of the insurance upon payment of the alimony, and specified that the "respective rights and obligations of the parties hereunder are deemed independent and may be enforced independently irrespective of any of the other rights and obligations set forth herein."

¶3.     In March 2013, Leslie filed a petition for contempt with the chancery court alleging Lee had failed to pay the last two months of lump-sum alimony payments of $10,000 for February and March 2013.  He had also failed to provide proof of life-insurance coverage for Leslie.  In response, Lee filed an answer and cross-complaint requesting, among other matters, that the chancery court interpret Lee's obligation to maintain a life insurance policy in the amount of $1.08 million for Leslie, and that Leslie reimburse him $30,000 that he had advanced to her on the sale of the marital home.  Lee argued that the life insurance was to protect Leslie's lump-sum alimony payments in the event of his premature death, and that she

2

would no longer have an insurable interest once the alimony was paid in full.

¶4. In January 2014, trial was held on Leslie's contempt petition and Lee's cross-complaint. Lee testified that he originally purchased the policy in 1996 when still married to Leslie, with her as the initial beneficiary. The policy had a face value of $1.5 million. When Lee remarried in July 2004, approximately three and one-half months after his divorce from Leslie, he made his new wife the beneficiary of the policy. On August 6, 2004, Lee executed an "Assignment of Life Insurance Policy as Collateral" (Assignment) listing Leslie as Assignee, which gave her "[t]he sole right to collect from the Insurer the net proceeds of the Policy when it becomes a claim by death or maturity." The Assignment also provided the following:

> This [A]ssignment is made and the Policy is to be held as collateral security for any and all liability of the undersigned, or any of them, to the Assignee, either now existing or that may hereafter arise in the ordinary course of business between any of the undersigned and the Assignee (all of which liabilities secured or to become secured are herein called "Liabilities").

¶5. Over the objection of Leslie's counsel, both parties testified at trial about the intent of the life-insurance provision in the Agreement. Lee claimed the intent of the policy was to insure payment of the lump-sum alimony in the event of his death before all payments had been made. Leslie testified that the policy was to remain in effect permanently, with her as the beneficiary. She claimed the policy was to provide security for her since she had been a stay-at-home mother for twenty-six years and did not have a college degree. She thought it was to protect the alimony, as well as an entitlement independent from the lump-sum alimony.

3

¶6.     The parties' attorneys negotiated the Agreement.  Leslie's attorney testified:

> One of her biggest arguments to me was that she needed security.  And she felt like that if she had an insurance policy that covered not only the . . . alimony, but would . . . help her have security for later in life, that's what she really wanted.  I mean, she emphasized that to me.
>
> I don't really recall exactly what [Lee's attorney] and I talked about. I do know that it was my position all along that the insurance policy was going to last until the death of either one of them.  And I know that that's not unprecedented in our practice, and according to the case law, that's happened before.  So my position is that the intent that we had, from our viewpoint, was that this policy of insurance for $1,080,000 would be maintained until the death of either one of them. . . .
>
> [M]y conferences with my client involved on many occasions . . . my promise to her that, yes, this does not terminate upon the payment of the alimony.

¶7.     On May 12, 2014, the chancellor entered a final judgment finding Lee in contempt for his failure to pay Leslie the $20,000 in alimony payments.  Lee was also ordered to maintain the life insurance policy in the amount of $1.08 million naming Leslie as beneficiary, and pay $5,000 in attorney's fees.  Leslie was ordered to pay Lee $30,000 for the advance on the marital home.  Lee appealed solely on the issue of maintaining a permanent $1.08 million life insurance policy naming Leslie as beneficiary.

## STANDARD OF REVIEW

¶8.     A chancellor's interpretation and application of the law is reviewed de novo. *Tucker v. Prisock*, 791 So. 2d 190, 192 (¶10) (Miss. 2001).  Here, the resolution of the case is tied to the interpretation of the Agreement.  Since a property-settlement agreement is a contract, and the interpretation of a contract is a matter of law, the standard of review is de novo. *Warwick v. Gautier Util. Dist.*, 738 So. 2d 212, 215 (¶8) (Miss. 1999); *McLeod v. McLeod*,

4

84 So. 3d 804, 807 (¶17) (Miss. Ct. App. 2011) (quoting *Meek v. Warren*, 726 So. 2d 1292, 1293-94 (¶3) (Miss. Ct. App. 1998)).

## ANALYSIS

¶9.     Lee makes three arguments regarding his life-insurance obligation to Leslie. First, he claims that the trial court erred in relying on *Sheppard v. Pace*, 757 So. 2d 173 (Miss. 2000), to find that the absence of language in the Agreement on the termination of Lee's obligation to maintain the life insurance policy means a continuing obligation to maintain it. Second, he argues the trial court should have found that the Agreement was ambiguous about the life insurance policy because there was no express term of duration. Finally, Lee maintains that once he satisfied the payment of the lump-sum alimony, Leslie no longer held an insurable interest in Lee's life, so he should not be required to maintain the policy. We shall discuss each of Lee's arguments in turn.

¶10.    The pertinent provisions of the Agreement are as follows:

8.
*LUMP SUM ALIMONY/SPOUSAL SUPPORT*

Lee shall pay spousal support to Leslie, in the form of lump sum alimony, the total sum of $1,080,000.00, payable in monthly installments of $10,000.00 each for a period of nine years. Such payments for support shall be due and payable by automatic bank transfer from Lee's checking or other account directly into Leslie's checking account, commencing on the fifth day of April, 2004, and shall so continue for one hundred and seven consecutive months thereafter. Lee's obligation to pay such support to Leslie shall be fully vested upon the entry of a Final Judgment of Divorce in this cause, and shall not be modifiable. *Lee's obligation to pay such support shall not terminate upon Leslie's death or remarriage, nor shall it terminate upon Lee's death.* However, despite the conventional definition of lump sum alimony[,] . . . these payments by Lee to Leslie under this Agreement shall be taxable to Leslie, and deductible by Lee, for state and federal income tax purposes.

5

9.
*LIFE INSURANCE*

Lee agrees to maintain life insurance on his own life in an amount not less than one million, eighty thousand dollars ($1,080,000.00), naming Leslie as primary beneficiary thereon. Proof of such insurance coverage shall be furnished to Leslie within fifteen (15) days following the date of execution of this Agreement. Furthermore, Lee shall direct his insurance carrier to provide coverage information to Leslie at least twice a year if requested by Leslie.

. . . .

13.
*EFFECT OF AGREEMENT*

. . . .

*The respective rights and obligations of the parties hereunder are deemed independent and may be enforced independently irrespective of any of the other rights and obligations set forth herein.* This Agreement contains the entire understanding of the parties, who hereby acknowledge that there have been and are no representations, warranties, covenants, or understandings other than those expressly set forth herein.

14.
*RELEASE AND WAIVER*

Subject to the provisions of this Agreement, each party has released and forever discharged . . . his or her heirs, legal representatives, Executors, Administrators, and assigns . . . from all causes of action, claims, right or demands . . . in law or in equity . . . except . . . causes of action for divorce or separation action now pending . . . .

Each party releases, waives, and relinquishes any and all rights . . . to share in the estate of the other party upon the latter's death . . . .

(Emphasis added.)

¶11. The chancellor found the language of the parties' Agreement unambiguous, and that it did not "expressly state that the life-insurance provision would terminate upon the final payment of lump sum alimony." Also, she stated the life-insurance obligation was not tied

to the alimony, but was a separate obligation set forth in a separate section of the Agreement. Moreover, the alimony did not terminate upon Lee's death; therefore, Leslie did not need a life insurance policy, because Leslie would have a claim against Lee's estate for any unpaid alimony. Accordingly, the chancellor ruled that under the Agreement, Lee "is to maintain a life insurance policy with [Leslie] as primary beneficiary in the amount of $1,080,000 and provide [Leslie] with proof of said policy."

## I.     Reliance on *Sheppard v. Pace*

¶12.    Lee claims the trial court erroneously relied on *Sheppard*, 757 So. 2d 173, for the proposition that the absence of language about termination of the maintenance of life insurance meant that maintenance was a continuing obligation. *Sheppard* involved a probate dispute where a divorce settlement provided that the ex-husband pay the ex-wife permanent alimony every month until she died or remarried, but the agreement said nothing regarding the impact of the ex-husband's death on the obligation, even though the ex-husband was required to maintain life insurance for the ex-wife's benefit. *Id.* at 174, 176 (¶¶1, 15). The agreement was binding on the parties, their administrators, executors, and assigns. *Id.* at 174 (¶10). When the ex-husband died, the ex-wife, who had never remarried, filed a claim in her ex-husband's probate proceedings for future alimony payments totaling $412,853.95 based on her life expectancy. *Id.* at 174 (¶5). The chancery court ruled in favor of the ex-husband, finding the alimony was periodic, and therefore terminated at the death of the ex-husband, but the court did not consider whether the agreement bound the ex-husband's estate. *Id.* at 175 (¶11). The supreme court held that the absence of language involving the termination

7

of the alimony at the ex-husband's death meant the alimony agreement was binding on his estate, and continued after his death. *Id.* at 175-76 (¶¶13-14). The agreement also provided that the ex-husband was to maintain a life insurance policy naming his ex-wife as primary beneficiary. *Id.* at 176 (¶15). The supreme court, adopting the rationale of other states, stated "there is no reason why the life insurance cannot be in addition to the [alimony] payments." *Id.* at (¶19) (quoting *In re Estate of Ervin*, 243 A.2d 420, 423 (Pa. 1968)). Because there was no language in the agreement that tied the life insurance policy to the alimony payments, the supreme court concluded that the policy was not provided in lieu of the alimony payments, for there was no proof of this intent. *Id.* at (¶20).

¶13. Lee argues that *Sheppard* is distinguishable because there is no dispute that Lee's alimony obligation is lump sum and therefore binding on his estate, unlike *Sheppard*. Additionally, he states that the issue here is whether Leslie can collect on the life insurance upon his death even after he has satisfied the lump-sum alimony, whereas in *Sheppard*, the alimony obligation only continued until the wife died or remarried. Further, Lee contends that unlike *Sheppard*, the lump-sum alimony and life-insurance policy are tied together by the amount of $1.08 million,[1] and by proximity to one another in the Agreement.

¶14. We are not persuaded by Lee's arguments, and find *Sheppard* sufficiently analogous to support the chancellor's ruling in Leslie's favor. In *Sheppard*, as here, there was no language involving the termination of the alimony in the agreement. In fact, at trial the Voulters both testified there was no termination date for the life-insurance obligation in the

---

[1] The $1.08 million figure is derived from Lee's obligation to pay $10,000 for nine years, or 108 months.

Agreement, and both of their attorneys agreed. There is no reason why life insurance cannot be in addition to alimony, if the parties so contract, and as *Sheppard* holds. Moreover, the sum of $1.08 million is the only matter that ties the alimony and life insurance together. The life insurance policy itself was worth $1.5 million; Leslie requested $1.08 million from the policy as "security" during the property-settlement negotiations. The life insurance and alimony obligations were discussed in two separate and distinct sections of the Agreement; there is no language that ties them together. The Agreement expressly provides that the rights and obligations of the parties "are independent and may be enforced independently."

¶15. Further, Lee's obligation to pay the lump-sum alimony does not terminate with his death. Accordingly, Leslie had no need for a life insurance policy to insure her alimony payments after Lee's death because she would have a claim against Lee's estate for any unpaid alimony.[2] *Sheppard* is analogous because the ex-wife was able to sue the ex-

---

[2] Lee agrees that the alimony is lump sum and binding upon his estate if not paid in full by his death; however, he notes that without the life insurance, Leslie would have no assurance his estate would have sufficient funds to pay any claim. In his reply brief, however, Lee contradictorily argues that the Agreement does not contain a provision that Leslie's right to alimony be enforceable against Lee's estate, and that the rule in Mississippi is that "absent an express provision that alimony shall be paid by the payor's estate after the death of the payor, the obligation cannot be made an obligation of the estate." *Sheppard*, 757 So. 2d at 175 (¶9) (citing *In re Estate of Peacocke*, 694 So. 2d 1252, 1254 (Miss. 1997)). However, in *Peacocke* the alimony obligation was periodic, unlike here, where it is lump sum. *Peacocke*, 694 So. 2d at 1253. In Mississippi, it is well established that periodic alimony terminates with the death of the payor or remarriage of the payee. *Id.* at 1254.

Lee then goes on to argue that the alimony should be considered periodic and not lump sum due to the tax implications specified in the Agreement under Item 8, which state: "However, despite the conventional definition of lump sum alimony as articulated by the Mississippi Supreme Court and otherwise, these payments by Lee to Leslie under this [A]greement shall be taxable to Leslie, and deductible by Lee, for state and federal income

husband's estate as well as be entitled to the life insurance proceeds. *Sheppard*, 757 So. 2d at 176 (¶¶19-20). Moreover, as Leslie pointed out, under the Agreement, if Lee died with only $10,000 in alimony unpaid, Leslie would be entitled to the full $1.08 million in life insurance, and still be able to sue his estate for the outstanding $10,000.

¶16. The trial court's reliance on *Sheppard* to support its ruling was appropriate.

## II.    Ambiguity in the Agreement

¶17. Lee argues the provisions in the Agreement regarding the life insurance are ambiguous, as there are no express terms for its duration, nor does the Agreement specify termination at Leslie's death or maintenance for her estate. Lee also maintains that Items 8 and 9 of the Agreement conflict with one another when read together. Thus, he claims our Court must resort to the intent of the parties through parol evidence. The only intent of the life insurance, he maintains, was to protect Leslie's alimony payments until she was paid in full. He claims his collateral assignment of the exact amount of the lump-sum alimony to Leslie is compelling evidence to support this fact.

¶18. A property-settlement agreement creates a contract, and will be interpreted according to contract principles. *In re Estate of Hodges*, 807 So. 2d 438, 445 (¶26) (Miss. 2002). Within the "four corners" of the agreement, if the language is unambiguous, the reviewing court will "not [be] concerned with what the parties may have meant or intended[,] . . . for the language employed in a contract is the surest guide to what was intended." *Beezley v.*

---

tax purposes." Thus, Lee claims the alimony cannot be a claim against Lee's estate because of its periodic nature. We find this argument without merit; the Agreement specifies that the alimony was lump sum.

*Beezley*, 917 So. 2d 803, 807 (¶14) (Miss. Ct. App. 2006) (quoting *Shaw v. Burchfield*, 481 So. 2d 247, 252 (Miss. 1985)). If the language is unclear, the court will "harmonize the provisions in accord with the parties' intent." *West v. West*, 891 So. 2d 203, 210-11 (¶14) (Miss. 2004) (quoting *Pursue Energy Corp. v. Perkins*, 558 So. 2d 349, 351 (Miss. 1990)). If the intent is still ambiguous, the canons of construction are utilized to understand the intent. Finally, parole or extrinsic evidence may be considered if necessary. *West*, 891 So. 2d at 211 (¶14) (citation omitted).

¶19.　The chancellor found that the Agreement did not expressly state that the life-insurance requirement would terminate upon satisfaction of the lump-sum-alimony payments; thus, it was a continuing obligation. We agree with this reading of the Agreement, and that its terms are not ambiguous. Just because there was no termination provision did not make the Agreement ambiguous. Lee attempts to read ambiguity and conflict into the Agreement, but there is none on its face. Moreover, "[t]he mere fact that the parties disagree about the meaning of a provision of a contract does not make the contract ambiguous as a matter of law." *Ivison v. Ivison*, 762 So. 2d 329, 335 (¶16) (Miss. 2000) (quoting *Delta Pride Catfish, Inc. v. Home Ins. Co.*, 697 So. 2d 400, 404 (Miss. 1997)).

¶20.　Lee cites *Beezley*, 917 So. 2d 803, in support of his contention that the Agreement is ambiguous. In *Beezley*, the issue was whether the husband's spousal-support obligations were a property settlement, and thus modifiable. *Id.* at 805 (¶2). This Court found the child-support and property-division agreement ambiguous. *Id.* at 807 (¶15). It was unclear whether the payments, termed "spousal support," were intended as alimony, and if so, what

type. *Id.* at 807-08 (¶¶15-16). Additionally, the respective provisions were in two separate divisions, there was no provision for a fixed total amount or the duration of the monthly payment, and it was unclear whether the obligations would continue after the ex-husband's death. *Id.* at 807 (¶15). Here, we find no comparable ambiguity in the Agreement to that in *Beezley*. Further, in *Beezley*, the parties agreed that the life insurance was a substitute for spousal support upon the ex-husband's death, unlike here. *Id.* at 806 (¶7).

¶21. Within its four corners, the Agreement's language is unambiguous; thus our Court does not need to discuss the possible intent of the parties. Section 13 of the Agreement specifically states it "contains the entire understanding of the parties, who hereby acknowledge that there have been and are no representations, warranties, covenants, or understandings other than those expressly set forth herein." Accordingly, we do not read the text of Item 8 on alimony to limit, modify, or make ambiguous the life-insurance provision of Item 9. Furthermore, Lee's assignment is not proof of any meaning within the Agreement; instead, it directly conflicts the Agreement's language, which states Leslie is to be named primary beneficiary. Under the Agreement, Leslie is entitled to receive the lump-sum-alimony payments and the life insurance benefits as two separate elements of the property division. This is in full accord with Section 13's express provision that the rights and obligations of the parties are "independent."

### III. Insurable Interest

¶22. Lee argues that once his lump-sum-alimony obligation was met, any insurable interest Leslie had in Lee's life ceases to exist, thereby eliminating Lee's obligation to provide life

12

insurance for her and voiding any insurance policy.

¶23.    "Mississippi follows the general rule that in order to be entitled to proceeds from an insurance policy, the purchaser of the policy must have an insurable interest in the property or life insured." *N. Am. Co. for Life & Health Ins. v. Lewis*, 535 F. Supp. 2d 755, 759 (S.D. Miss. 2008) (quoting *Aetna Cas. & Sur. Co. v. Davidson*, 715 F. Supp. 775, 776 (S.D. Miss. 1989)).  "Insurable interest" is defined as having "a reasonable ground, founded upon the relations of the parties to each other, either pecuniary or of blood or affinity, to expect some benefit or advantage from the continuance of the life of the assured." *Id.* (quoting *Nat'l Life & Acc. Ins. Co. v. Ball*, 157 Miss. 163, 165-66, 127 So. 268, 268 (1930)).  First, we note that Lee, the buyer of the policy, and not Leslie, must have an insurable interest in himself.  Lee was free to obtain a life insurance policy on his own life and make whomever he wanted beneficiary.  Under the Agreement, however, Lee agreed to maintain a life insurance policy on his own life, with Leslie as primary beneficiary.  Lee states that the Agreement was structured in this manner to protect Leslie if Lee died insolvent or if his estate was without sufficient assets to pay Leslie's claim.

¶24.    Lee claims that now he is remarried, it is "repugnant" for him to continue to maintain life insurance for his ex-wife when there is no longer any relationship with her "by blood or affinity."  In support of his argument, Lee cites Mississippi Code Annotated section 83-5-251(1) (Rev. 2011), which states "no person shall procure or cause to be procured any insurance contract upon the life or body of another individual unless the benefits under such contract are payable to the insured or his personal representative or to the person having, *at*

13

*the time when such contract was made*, an insurable interest in the insured." (Emphasis added). Lee acknowledges that the insurable interest must exist at the time the contract is made, but claims once his alimony obligation is met, this interest is extinguished and the policy is void. We disagree.

¶25. Leslie did not "procure" life insurance on Lee's life. The only thing she did to "cause [the insurance] to be procured" was to require the life-insurance provision be included in the Agreement. When the insurance policy was purchased in 1996, any insurable interest in Lee's life remained, as they were still married, though contemplating divorce, and Lee had financial obligations to Leslie. Under section 83-5-251(1), it was not necessary for Leslie to retain this interest with Lee in order for the policy to remain valid, only to have an interest "at the time when such contract was made." Even though Lee no longer "desires" to name Leslie as beneficiary, he contracted to do so in the Agreement. This argument is without merit.

### IV. Attorney's Fees

¶26. Leslie requests attorney's fees for the current appeal because the chancellor found Lee in contempt of court, and because Leslie was unemployed and had not paid her attorney's fees for the chancery court proceeding, which totaled $5,000. She submits an addendum showing appellate attorney's fees and expenses totaling $4,487.35, but asks for an award of $2,500, which equals one-half of the $5,000 awarded by the chancellor.

¶27. Generally, in divorce and child-custody actions, "appropriate attorney's fees should be awarded in an amount to secure a competent attorney." *Webster v. Webster*, 17 So. 3d

14

602, 609 (¶19) (Miss. Ct. App. 2009) (quoting *Bounds v. Bounds*, 935 So. 2d 407, 412 (¶18) (Miss. Ct. App. 2006)). "However, in contempt actions, attorney's fees are awarded 'to make the plaintiff whole.'" *Bounds*, 935 So. 2d at 412 (¶18) (citing *Mabus v. Mabus*, 910 So. 2d 486, 490 (¶13) (Miss. 2005)). "When a party is held in contempt for violating a valid judgment of the court, then attorney's fees should be awarded to the party that has been forced to seek the court's enforcement of its own judgment." *Id.* (quoting *Elliott v. Rogers*, 775 So. 2d 1285, 1290 (¶25) (Miss. Ct. App. 2000)). Further, attorney's fees may be awarded "on appeal in the amount of one-half of what was awarded in the lower court." *Grant v. Grant*, 765 So. 2d 1263, 1268 (¶19) (Miss. 2000) (citing *Monroe v. Monroe*, 745 So. 2d 249, 253 (¶17) (Miss. 1999)). "The fee should be fair and should only compensate for services actually rendered after it has been determined that the legal work charged for was reasonably required and necessary." *Creekmore v. Creekmore*, 651 So. 2d 513, 520 (Miss. 1995) (quoting *Dunn v. Dunn*, 609 So. 2d 1277, 1286 (Miss. 1992)). Ultimately, however, the decision whether to award attorney's fees on appeal is at the discretion of the appellate court. *Howard v. Howard*, 968 So. 2d 961, 980 (¶53) (Miss. Ct. App. 2007) (citing *Riddick v. Riddick*, 906 So. 2d 813, 829 (¶52) (Miss. Ct. App. 2004)).

¶28. Here, Lee was found in contempt of court for failure to pay the last two months of lump-sum alimony. Leslie's attorney states she is unemployed and has not paid her attorney's fees for the chancery court proceedings. She submits proof of reasonable, detailed attorney's fees. Accordingly, we grant Leslie's request for an award by Lee of $2,500 in appellate attorney's fees.

¶29. **THE JUDGMENT OF THE CHANCERY COURT OF WARREN COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.**

**LEE, C.J., IRVING AND GRIFFIS, P.JJ., MAXWELL, FAIR AND WILSON, JJ., CONCUR. ISHEE, CARLTON AND JAMES, JJ., NOT PARTICIPATING.**